# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————

No. 11-1569

—————

United States of America,

        Appellee,

v.

Donald J. Herbst, Sr.,

        Appellant.

\*   Appeal from the United States
\*   District Court for the Northern
\*   District of Iowa.

—————

Submitted: October 20, 2011
Filed: February 14, 2012

—————

Before MELLOY, BEAM, and GRUENDER, Circuit Judges.

—————

BEAM, Circuit Judge.

The district court[1] sentenced Donald Herbst, Sr., to 70 months' imprisonment after a jury convicted him of (1) one count of conspiracy to buy, receive, and possess goods stolen from an interstate shipment of freight, in violation of 18 U.S.C. §§ 371 and 659, and (2) nine counts of buying, receiving, or possessing goods stolen from an interstate shipment of freight, in violation of 18 U.S.C. § 659. Herbst appeals his conviction and sentence, asserting that (1) there is insufficient evidence that he knew the goods at issue (meat products) were stolen; (2) the district court erred when it

—————

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

excluded a defense witness's testimony under Federal Rule of Evidence 403; (3) the prosecutor made improper comments during closing arguments; and (4) his sentence is procedurally unsound and substantively unreasonable. We affirm.

## I.    BACKGROUND[2]

During the relevant period, Farmland Foods, Inc., stored meat products in an AmeriCold facility in East Dubuque, Illinois, and McFarland Truck Lines operated as an interstate trucking carrier of Farmland products. Between 2006 and September 2007, James Patterson and his brothers, employed as McFarland truckers, stole over $187,000 worth of Farmland meat–bacon, bacon-wrapped filets, ribs, ham, etc.–out of trailers they hauled from the AmeriCold facility. The Patterson brothers hauled the stolen meat to James's property in Zwingle, Iowa, where it was loaded into a van for delivery to buyers in the Dubuque area. James's daughters and his wife, Patricia, aided in loading meat into the van and dispersing it to customers.

In August 2006, Herbst first purchased some of the stolen Farmland meat from Butch Maas, one of the Pattersons' customers. Beginning in September 2006, however, Herbst began buying meat directly from the Pattersons. Over the next year, Herbst made purchases approximately every two weeks, receiving up to 3,000 pounds of meat per purchase at $1 per pound. Herbst paid the Pattersons in $100 bills and resold the meat to approximately 30 others. Herbst estimated at trial that he purchased a total of 12,000 to 15,000 pounds of meat from the Pattersons and resold 99 percent of what he purchased. James Patterson testified that Herbst purchased two-thirds of all the meat the Pattersons stole. Although Herbst and his wife kept "to the penny" records for their business, Dubuque Hose & Hydraulics, they did not keep any receipts or written records for their meat transactions.

---

[2]We recount the facts in the light most favorable to the jury's verdict. United States v. Starr, 533 F.3d 985, 990 (8th Cir. 2008).

In early September 2007, Farmland hired private investigators to determine the source of product losses at the AmeriCold facility. On September 9, the investigators witnessed a noticeably weighed-down van leave James Patterson's property and drive toward Dubuque. While following the van, the investigators noticed a case of Farmland meat pushed against the van's window. The van drove to Herbst's residence, backed into the garage, the garage door closed, and the van emerged thirty minutes later. The private investigators contacted law enforcement regarding their observations and police officers confronted James Patterson. James agreed to set up a controlled sale of meat to Herbst and, after calling Herbst, delivered 25 cases of meat to Herbst's business while wearing a wire. During the exchange, Herbst told James that he was "pretty careful" about picking those to whom he resold meat because he did not want to get himself "in trouble."

After the controlled buy, officers confronted Herbst and he admitted that he had "suspicions" that the meat was stolen. Herbst also told officers that he marked up cases of meat between $3 and $5 for resale. During a search of Herbst's person, officers recovered a small notebook that listed the names and phone numbers of James and Patricia Patterson and Herbst's meat customers. When officers asked Herbst about the notebook, he said, "It's only numbers." While searching the basement of Herbst's residence, officers located Farmland meat in freezers and a safe containing $61,750, almost all of which was in $100 bills. Prior to opening the safe, Herbst told officers that there was only $15,000 to $17,000 in the safe. At trial, Herbst claimed the money in the safe was from sources other than meat sales.

On July 27, 2010, Herbst was charged in a superceding indictment with one count of conspiracy to buy, receive, and possess stolen meat, and ten counts of buying, receiving, and possessing the same. The primary issue at trial was whether Herbst knew the meat was stolen. Herbst took the stand and denied any such knowledge, asserting that James Patterson told him the meat was being sold because it was either damaged or outdated. Herbst also called Butch Maas, who testified that he told Herbst

the meat was expired. In contrast, the government called James Patterson, who testified that, although he never expressly told Herbst the meat was stolen, he assumed Herbst knew as much. James pointed out that, when making deliveries, the Pattersons concealed the meat in the back of their van with blankets. And, if the deliveries were made to Herbst's residence, the Pattersons backed their van into Herbst's garage, Herbst closed the garage door, and then the Pattersons and Herbst unloaded the meat. If the deliveries were made to Herbst's business, the Pattersons drove their van through a gate and the gate closed behind the van prior to unloading. After considering such evidence, the jury found Herbst guilty of conspiracy and all but one of the remaining counts,[3] and the district court sentenced Herbst to a total of 70 months' imprisonment. Herbst appeals.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Herbst asserts that there was insufficient evidence that he knew the meat he purchased from the Pattersons was stolen. To support this contention, Herbst emphasizes that James Patterson never expressly told him the meat was stolen[4] and that Butch Maas told him the meat was outdated. While Herbst acknowledges that he began to suspect the meat was stolen, he claims that he ultimately concluded the meat was not stolen because he assumed Farmland would have more quickly detected such a large loss of product. We review sufficiency challenges de novo, "viewing the

---

[3]The jury found Herbst not guilty on Count 5, which charged Herbst with knowingly buying, receiving, or possessing stolen meat products worth more than $1,000 on July 8, 2007.

[4]We note that, to sustain a conviction for conspiracy, it is sufficient for the government to prove that "the conspiracy consisted of a tacit or implicit understanding–it is not required that the conspiracy be explicit or expressed." United States v. Rodriguez, 414 F.3d 837, 845 (8th Cir. 2005).

evidence in the light most favorable to the verdict, accepting all reasonable inferences that support the verdict, and reversing only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Reaves, 649 F.3d 862, 868 (8th Cir. 2011) (quotation omitted). Importantly, under the willful blindness doctrine, the knowledge element of an offense is satisfied if the defendant acts "with an awareness of the high probability of the existence of the fact in question" and "deliberately fail[s] to make further inquiries, intending to remain ignorant." United States v. Chavez-Alvarez, 594 F.3d 1062, 1067 (8th Cir. 2010) (internal quotation omitted). The district court instructed the jury regarding willful blindness with no objection from the parties.

Despite Herbst's assertions to the contrary, our review of the record discloses more than sufficient evidence to support the jury's finding that Herbst either actually knew the meat was stolen or acted with willful blindness to that fact. For the sake of brevity, we highlight only some of the more telling evidence here: (1) Herbst purchased thousands of pounds of meat from the Pattersons at only $1 per pound over the period of one year; (2) Herbst ordered specific meat products from the Pattersons; (3) Herbst told one of his meat customers, "Well at least [the Pattersons] are stealing the good stuff"; (4) after police confronted Herbst, Herbst told one of his meat customers "not to say anything" to police regarding the meat; (5) Herbst told James Patterson during the controlled buy that he was "pretty careful" while picking meat customers because he did not want to get himself "in trouble"; (6) Herbst and the Pattersons unloaded the meat behind closed doors; (7) Herbst admitted at trial that he lied to officers when he grossly understated the amount of cash in his safe, which contained $61,750 in mostly $100 bills; (8) Herbst only paid the Pattersons in cash, typically in $100 bills; and (9) while Herbst and his wife otherwise kept "to the penny" business records, they did not keep any written records of meat transactions. In addition, while Herbst asserted at trial that he thought the meat was outdated, he conceded that he never checked the dates on the meat packages and the government presented evidence that meat Herbst purchased from the Pattersons was not expired.

-5-

Similarly, while Herbst acknowledged that he suspected the meat was stolen, he testified that he kept buying meat and made "no attempt to find out where the meat was coming from." Based on this mountain of evidence, we hold that a reasonable jury could have easily found Herbst guilty beyond a reasonable doubt.

## B. Exclusion of a Defense Witness

After the government rested its case, Herbst admitted into evidence his 2007 tax return, which reported income from meat sales in 2007. During direct examination, Herbst testified that he did not report income from meat sales on his 2006 tax return because he sold the meat at cost in 2006. Herbst's accountant later opined that, if Herbst sold the meat at cost in 2006, it was "probably arguable" whether Herbst was required to report such sales for tax purposes. The accountant pointed out that Herbst did not discuss meat sales with him until after police confronted Herbst in late 2007. Later, Herbst attempted to admit the testimony of a tax expert to lend credence to his assertion that he was not required to report meat sales on his 2006 tax return. During an offer of proof outside the presence of the jury, the tax expert testified that *if* Herbst sold meat at cost in 2006 as a not-for-profit activity, he was not required to report the sales on his 2006 tax return. The district court excluded such testimony under Federal Rule of Evidence 403, reasoning that the testimony was cumulative of the accountant's testimony, had limited relevance because "this is not a tax case," and would confuse the jury and waste time. During closing arguments, the prosecutor argued that Herbst did not report the sales on his 2006 return because the meat was stolen and that Herbst only reported the sales on his 2007 return to cover his tracks after he was confronted by police.

Herbst asserts that the district court's exclusion of the tax expert's testimony violated his constitutional right to present a complete defense. He claims that such testimony was relevant because it lent credibility to his proffered reason for reporting meat sales on his 2007 tax return but not his 2006 tax return. Under the Fifth and

Sixth Amendments, "[c]riminal defendants have a fundamental right to present the testimony of witnesses in their defense." United States v. Turning Bear, 357 F.3d 730, 733 (8th Cir. 2004). To demonstrate a violation of this right, the defendant must "at least make some plausible showing of how [excluded] testimony would have been both material and favorable to his defense." Id. (quotation omitted). While the Constitution leaves trial judges "wide latitude" to exclude "marginally relevant" or "repetitive" evidence, Crane v. Kentucky, 476 U.S. 683, 689 (1986) (quotations omitted), the arbitrary exclusion of testimony may violate a defendant's right to present a defense where the "testimony is otherwise admissible under the rules of evidence." Turning Bear, 357 F.3d at 733.

We need not decide whether the district court erred when it excluded the tax expert's testimony because any alleged error on this point was "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967); see United States v. Eagle, 498 F.3d 885, 889 (8th Cir. 2007) (applying harmless error analysis to alleged violation of the right to present a defense). As discussed above, the prosecution's case against Herbst was strong. In contrast, the probative value of the tax expert's testimony was relatively weak given that this is not a tax case. Indeed, the key issue before the jury was whether Herbst knew the meat was stolen, not whether his interpretation of the tax code was correct as a matter of law. And, although the accountant's testimony regarding reporting requirements was not as definitive as the tax expert's, the accountant's testimony still supported Herbst's point–i.e., that Herbst's proffered explanation for not reporting meat sales on his 2006 tax return was plausible, assuming that he did, in fact, sell the meat at cost. Because the evidence of Herbst's guilt was strong, the probative value of the excluded evidence was relatively weak, and Herbst was permitted to present other evidence on this point, we are confident that the district court's alleged error "did not contribute to the verdict obtained." Chapman, 386 U.S. at 24; see Eagle, 498 F.3d at 889 (holding that alleged violation of right to present a defense was harmless where evidence of defendant's guilt was strong and the probative value of the excluded evidence was relatively weak).

## C.     Prosecutor's Closing Arguments

During cross-examination, Herbst testified that he settled a civil lawsuit with McFarland Truck Lines for $175,000.  He also acknowledged that he forfeited $15,000 of the $61,750 seized from his safe, but denied that the cash was related to meat sales.  Herbst's attorney did not object to this line of questioning.  Before closing arguments, Herbst's attorney proposed some modifications to the jury instructions to ensure that the jury would not find Herbst guilty based "solely" on the civil settlement and forfeiture.  Herbst's counsel acknowledged that the district court "resolve[d] that concern" by adopting his proposed Instruction 22, which read:

> You have heard evidence that the defendant was involved in civil cases related to this case and that settlements were reached in each of them. You are instructed that these settlements are not proof that the defendant committed any of the crimes alleged in the Indictment.  The burden of proof in any civil action is by a preponderance of the evidence, which is a much lesser burden of proof than in a criminal case, which is beyond a reasonable doubt.
>
> You are instructed that you may give the evidence regarding settlement such weight as you decide it deserves in relation to this case.

During closing arguments, the prosecutor discussed the details of Herbst's forfeiture and then rhetorically asked, "And sure, there's a different standard of proof in a civil versus a criminal case, but why would you give any of [the money] back? Why would you give any of it back under any standard of proof if it had nothing to do with nothing?"  With regard to the McFarland settlement, the prosecutor similarly argued, "Now, again, there's a different standard of proof.  Would you pay a large chunk of money like that if you didn't do anything wrong."  Herbst's attorney did not object to such comments, but later argued to the jury that the prosecutor's arguments were contrary to Instruction 22.  The prosecutor objected to the suggestion that his

-8-

argument was improper, and the district court stated, "I find no improper conduct by the prosecutor on that issue." Herbst's attorney then proceeded to argue that Herbst entered into the civil settlements for "reasons other than guilt." During rebuttal, the prosecutor made some comments regarding the fact that Herbst included a deduction for legal expenses related to forfeiture proceedings on his 2007 tax return. Again, Herbst's attorney did not object to these comments.

Herbst asserts that the prosecutor's comments during closing arguments were contrary to Instruction 22 and misrepresented the evidence. "To obtain a reversal for prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced the defendant's rights in obtaining a fair trial." United States v. Crumley, 528 F.3d 1053, 1064 (8th Cir. 2008) (quotation omitted). If the prosecutor's comments were improper, "we consider the cumulative effect of the improprieties, the strength of the evidence against the defendant, and whether the district court took any curative action." Id. (quotation omitted). Here, however, our analysis is altered by the fact that Herbst failed to object to the prosecutor's comments "at the earliest possible opportunity after the ground of objection [became] apparent." United States v. West, 612 F.3d 993, 996 (8th Cir. 2010) (quotation omitted), cert. denied, 131 S. Ct. 1028 (2011). Under these circumstances, we review for plain error, reversing "only if the error was plain and the district court's failure to take action seriously affected both the defendant's substantial trial rights and the fairness, integrity or public reputation of judicial proceedings." Crumley, 528 F.3d at 1064 (internal quotation omitted).

Assuming without deciding that the prosecutor's comments were improper, Herbst cannot demonstrate the requisite prejudice under plain-error review–"that is, a reasonable probability that the outcome would have been different absent the alleged error." United States v. Littrell, 439 F.3d 875, 883 (8th Cir. 2006). Indeed, the evidence of Herbst's guilt was strong, the district court instructed the jury–both verbally and in writing–that the attorneys' arguments were not evidence, the jury was

instructed regarding the lower standard of proof in civil actions, and the prosecutor's comments comprise only a few sentences out of 89 transcribed pages of closing argument following a four-day trial. See United States v. Smith, 508 F.3d 861, 866 (8th Cir. 2007) ("[W]e presume that jurors follow their instructions."); United States v. Rodriguez, 612 F.3d 1049, 1056 (8th Cir. 2010) (finding that prosecutor's comments did not prejudice defendant where the remarks were isolated and there was strong evidence against the defendant). Thus, Herbst is not entitled to a new trial based on the prosecutor's remarks during closing arguments.[5]

## D.    Sentence

The district court calculated Herbst's advisory Guidelines range at 70 to 87 months' imprisonment based on a criminal history category of I and an offense level of 27. Then, after considering the sentencing factors in 18 U.S.C. § 3553(a), the district court sentenced Herbst to 70 months' imprisonment. Herbst appeals his sentence on numerous grounds.

First, Herbst contends that the district court implicitly applied a presumption of reasonableness to the Guidelines. This argument is belied by the fact that the district court, in its sentencing memorandum, expressly acknowledged that sentencing

---

[5]Although Herbst did not object to the prosecutor's comments at the time they were made, he asserts that plain-error review should not apply because the district court ruled–in response to the *prosecutor's objection*–that the prosecutor's initial comments were not "improper." Even if we applied our typical standard of review, however, we would not reverse Herbst's conviction. Assuming for the sake of argument that the prosecutor's comments were improper, Herbst cannot show that the prosecutor's "remarks prejudiced [Herbst's] rights in obtaining a fair trial." Crumley, 528 F.3d at 1064 (quotation omitted). As discussed in this section, the evidence against Herbst was strong, the prosecutor's comments were relatively isolated, and the jury was repeatedly instructed that attorneys' arguments are not evidence. See Rodriguez, 612 F.3d at 1056.

courts are not permitted to assume the Guidelines range is reasonable. Next, Herbst contends that the Guidelines violate the separation of powers doctrine and challenges the appellate presumption that a within-Guidelines sentence is substantively reasonable. These arguments are foreclosed by our precedent. United States v. Wilder, 597 F.3d 936, 945 (8th Cir.), cert. denied, 131 S. Ct. 344 (2010). Herbst also argues that the district court did not adequately explain his sentence. But, the district court issued an exhaustive 29-page sentencing memorandum, which calculates the advisory Guidelines range, discusses whether a departure would be appropriate, and considers the § 3553(a) factors to determine whether to impose a Guidelines or non-Guidelines sentence. See United States v. Haack, 403 F.3d 997, 1002-03 (8th Cir. 2005) (outlining proper sentencing procedure). While analyzing the § 3553(a) factors, the district court emphasized that Herbst obstructed law enforcement's investigation, lied on the witness stand, and showed no remorse. The court also noted the significant non-monetary harm the conspiracy caused to McFarland Truck Lines. We are more than satisfied on this record that the district court adequately explained Herbst's sentence. Finally, Herbst contends that his 70-month sentence is substantively unreasonable, but he has failed to overcome the presumption of reasonableness we afford his within-Guidelines sentence. See United States v. Blackmon, 662 F.3d 981, 988 n.6 (8th Cir. 2011).

## III.   CONCLUSION

We affirm.

_____