# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3161

_____

United States of America

*Plaintiff - Appellee*

v.

Lamarvin Darden

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 19, 2012
Filed: August 7, 2012

_____

Before MURPHY, MELLOY, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

Following a jury trial Lamarvin Darden was convicted of possessing with intent to distribute cocaine base, being a felon in possession of a firearm, and being an unlawful user of a controlled substance in possession of a firearm. The district court[1]

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

sentenced him to 200 months imprisonment. He appeals his conviction, arguing that the indictment should have been dismissed because the government engaged in misconduct during grand jury proceedings, that the district court erred by admitting irrelevant and unfairly prejudicial evidence, and that the prosecutor made improper comments during closing argument that deprived him of his right to a fair trial. We affirm.

I.

In October 2010 the St. Louis Metropolitan Police Department received information from a confidential informant (CI) indicating that Darden, a convicted felon, was distributing illegal drugs out of his grandparents' house. Police began surveillance of Darden and observed him in what appeared to be hand to hand drug transactions at their residence and saw him holding his waist in a manner consistent with concealing a firearm. Based on information from the CI and their own observations, the police obtained a search warrant for the grandparents' residence.

As they were preparing to execute the search warrant, the police saw Darden and the CI arrive at the residence in a Jeep, enter the house, and leave a few minutes later, headed back to the Jeep. Police approached the Jeep and saw Darden throw a bottle of NyQuil through the open window. They arrested both Darden and the CI, telling them they had a search warrant for the home.

While executing the search warrant, Detective Anthony Boettigheimer spoke with Freddie and Birdie Houston, Darden's grandparents. The detective testified that Mrs. Houston told him that she had been sewing in her bedroom when Darden arrived at the house. She explained that he had come into her bedroom, removed a ballistic vest from under his t shirt and placed it on the bed, and then stuffed an unknown object under the mattress. The detective asked Mr. Houston if he had any guns in the house. He replied that he did keep guns in his bedroom, which was separate from Mrs. Houston's, and that he owned a 9mm handgun.

Detective Boettigheimer then searched Mrs. Houston's bedroom where he saw a bulletproof vest lying on the bed and found a 9mm handgun under the mattress. Both were seized. According to trial testimony from another officer, Mr. Houston identified the 9mm handgun as his own, said that he hadn't seen it for about three weeks, and stated that he could not believe that Darden had stolen it. After the search was completed, Detective Boettigheimer left the house, went over to the squad car where Darden had been detained, and told him about the evidence he had discovered. Boettigheimer testified that Darden responded that he had the gun for his protection and that just before the police arrived he had placed the bulletproof vest on the bed and the gun underneath the mattress.

One week following Darden's arrest, a federal grand jury convened to consider his case. The Houstons had been subpoenaed to testify and the government also planned to present the testimony of Detective Joseph Steiger, a police officer who had been present when the search warrant was executed. On the morning of the grand jury hearing, the prosecutor and Detective Steiger met with the Houstons outside the grand jury room. Mrs. Houston said that she did not remember seeing the ballistic vest on her bed or seeing Darden place anything under the mattress. Mr. Houston explained that the 9mm handgun was in a drawer in his bedroom at the time the warrant was executed, and thus the police must have taken it from there rather than finding it under the mattress in his wife's bedroom.

Detective Steiger was the only witness called at the grand jury proceeding. He testified as a summary witness about the Houstons' statements at the time of Darden's arrest. He then related the positions the couple had taken on the morning of the grand jury proceeding, saying that the Houstons had both "kind of changed their statements" after the day of the search. He testified that after hearing their changed statements, he and the prosecutor had decided not to call them as witnesses. Members of the grand jury asked several questions about the Houstons' changed positions which

-3-

Detective Steiger and the prosecutor answered. The grand jury returned an indictment charging Darden with unlawful possession of a firearm.

Darden filed motions to suppress evidence seized from the Houstons' house and statements he had made following his arrest. He also filed a motion to dismiss the indictment based on the government's failure to call the Houstons to testify before the grand jury and alleged improper commentary from the prosecutor during the hearing. The district court denied the motions.

A five count superseding indictment was subsequently returned charging Darden with possessing with intent to distribute cocaine base, 21 U.S.C. § 841(a)(1), (b)(1)(C), possessing with intent to distribute hydrocodone, id., being a felon in possession of a 9mm semiautomatic pistol, 18 U.S.C. §§ 922(g)(1), 924(a)(2), (e)(1), possessing a 9mm semiautomatic pistol while being an unlawful user of or addicted to a controlled substance, id. §§ 922(g)(3), 924(a)(2), (e)(1), and being a violent felon in possession of body armor, id. §§ 931(a), 924(a)(7).

Darden's case proceeded to a four day jury trial during which the government called seven police officers, three criminalists, a drug distribution expert, a Federal Rule of Evidence 404(b) witness,[2] and the CI in its case in chief. Darden presented testimony by the Houstons and his own drug distribution expert.

Detective Boettigheimer testified regarding information received from the CI, his corroboration of that information through surveillance, the evidence seized while executing the search warrant, his conversations with the Houstons at the time of the

---

[2]A new version of the Federal Rules of Evidence went into effect on December 1, 2011 as part of the Federal Rules Style Project. Changes made as part of this project are "intended to be stylistic only." See Fed. R. Evid. 101 advisory committee's note. All quotations here are from the rules in effect during Darden's May 2011 trial.

search, and Darden's comments in the squad car when asked about the seized evidence. On cross examination defense counsel questioned the detective about the facts that the CI had indicated that Darden had both a 9mm and a .45 caliber firearm but the police had never found a .45 caliber firearm. During redirect the government played a phone call recorded between Darden and an unidentified man while he was in jail following his arrest. In the recording Darden said "I was trying to call you but you know what I'm sayin' have my girlfriend give you uh, that nickel for me . . . . [L]et you hold onto it, it plays xbox you hear me? . . . I had a nickel over there man, I wish you could hold onto it man."

Boettigheimer testified that a .45 caliber gun is sometimes referred to as a "nickel" and that the xbox video game system can be used to conceal guns. The government then introduced into evidence a photograph from the Houstons' home apparently depicting a red xbox and also attempted to introduce an internet printout of a red xbox for comparison purposes. The district court sustained an objection by defense counsel to introduction of the printout as unduly prejudicial. The government then called another police officer and introduced the printout through him. Defense counsel made no objection to this introduction of the printout.

The jury then heard testimony from a police officer who had overheard Darden make a phone call after he was booked in which he asked a friend to try to get his grandfather to claim possession of the gun taken into evidence, explaining he could not afford to be charged with a gun crime due to his criminal record. The government also presented Rule 404(b) evidence from a St. Louis police officer regarding a previous instance in which Darden had hidden a gun under a mattress. Testimony from the CI indicated that he had seen Darden with 9mm and .45 caliber guns, as well as a bulletproof vest. He also said that just before Darden's arrest the two men had entered the Houstons' home where Darden dropped off a gun and a ballistic vest. The jury also heard testimony from two officers involved in an August 2010 incident in

which Darden consented to a search which revealed him to be carrying cocaine base and hydrocodone pills and formed the basis of charges involving those drugs.

The jury found Darden guilty of possessing with intent to distribute cocaine base, being a felon in possession of a firearm, and being an unlawful user of a controlled substance in possession of a firearm. It acquitted him of possessing with intent to distribute hydrocodone and being a felon in possession of body armor. The district court sentenced him to 200 months imprisonment.

Darden appeals, arguing that his conviction should be reversed because the government committed misconduct during grand jury proceedings, the district court erred by admitting testimony regarding the xbox video game console and .45 caliber pistol because it was not relevant and unfairly prejudicial, and the government's closing argument contained improper remarks that substantially prejudiced his right to a fair trial.

II.

We first address Darden's contention that the district court erred by denying his motion to dismiss the indictment because of misconduct by the government during grand jury proceedings. Our review of a district court's denial of a motion to dismiss the indictment is for an abuse of discretion. United States v. Wadlington, 233 F.3d 1067, 1074 (8th Cir. 2000). Where a defendant alleges prosecutorial misconduct, dismissal of the indictment "is proper only when the defendant demonstrates flagrant misconduct and substantial prejudice." Id. at 1073.

Darden argues that the government acted improperly by not calling the Houstons to testify in front of the grand jury, thus keeping exculpatory evidence from the grand jury. The government is not obligated to present exculpatory evidence in grand jury proceedings, however, since "the grand jury sits not to determine guilt or

innocence, but to assess whether there is adequate basis for bringing a criminal charge," an undertaking for which it "has always been thought sufficient to hear only the prosecutor's side." See United States v. Williams, 504 U.S. 36, 51 (1992).

While the government had no obligation to present the Houstons' testimony, the grand jury was told that the Houstons disputed the comments attributed to them at the time of the search. Darden takes issue with one of the prosecutor's questions which asked Detective Steiger whether Mrs. Houston had "recanted" her earlier statements. Darden claims she did not "recant" her statements since she denied ever having made them. We agree with the district court's characterization of this argument as one of "semantics" because the grand jury was made aware that the Houstons contested the police version of what had been said.

Darden next argues that the prosecutor acted improperly by impugning the credibility of the Houstons through a suggestion that he had threatened his grandparents. He seizes on the following exchange which occurred after the prosecutor asked whether the grand jurors had any questions.

> G. Juror: Did you guys question the grandparents as to whether their grandson had threatened them, or if any of his friends had threatened them, or if any harm was going to come to them if they didn't change their story?
>
> Steiger: Today, you mean?
>
> G. Juror: Uh-huh.
>
> Steiger: No, we didn't talk about threats at all with [the Houstons]. I think they were more concerned with - - if they don't come in here, then they probably don't have anything to worry about because they are not

going to have any part of being testimony against him. But we can address that afterwards with them, too, ma'am.[3]

G. Juror: I think that's important to know, because elderly folks are very intimidated and sometimes ruled by their family members. That's . . .

Prosecutor: Absolutely. You know, that's one of the reasons - - well, I don't want to say anything before you vote.

Rather than supporting Darden's argument, this exchange makes clear that any suggestion that the Houstons had been intimidated by Darden initiated with the grand jurors themselves, not with the government. The prosecutor acted properly by refraining from discussing intimidation with respect to the Houstons prior to the grand jury's vote. Nothing in this record establishes the "flagrant misconduct" by the prosecutor or "substantial prejudice" to the defendant required for dismissal of an indictment. See Wadlington, 233 F.3d at 1073.

We next turn to Darden's argument that the district court erred by admitting evidence regarding a .45 caliber gun and an xbox. At trial Darden's only objection to this evidence was to the introduction through Detective Boettigheimer of an internet printout depicting an xbox. This picture was later admitted through another witness without objection. Our review is thus for plain error. See United States v. White Bull, 646 F.3d 1082, 1091 (8th Cir. 2011). To warrant reversal Darden must show that "(1) the district court committed an error, (2) the error is clear or obvious, and (3) the error affected his substantial rights." Id. Even if the defendant meets these three requirements of plain error, we will only reverse if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Puckett v. United States, 556 U.S. 129, 135 (2009) (alteration in original) (internal quotations and citation omitted).

---

[3]In his brief Darden attributes this statement to the prosecutor; the transcript indicates, however, that it was made by Detective Steiger.

-8-

Darden contends that any evidence concerning a .45 caliber gun and an xbox was irrelevant and unfairly prejudicial because he was not charged with possession of a .45 caliber firearm. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403.

We conclude that the evidence related to the .45 caliber firearm and an xbox became relevant after defense counsel's cross examination of Detective Boettigheimer. Counsel asked the detective if it were not true that the police had never recovered a .45 caliber weapon, thus impugning the CI's anticipated testimony that Darden had had both a .45 caliber and a 9mm gun. Because of this cross examination by the defense, the following evidence was relevant to corroborate the CI's story: evidence that Darden had previously talked about having a "nickel," that that term can be used to refer to a .45 caliber firearm, that such weapons can be hidden in xboxes, and that the Houstons' house had an xbox. The evidence was not unfairly prejudicial because it did not have an "undue tendency to suggest decision on an improper basis." United States v. Looking Cloud, 419 F.3d 781, 785 (8th Cir. 2005) (citation omitted). At the point in the trial where it was introduced, it would have been understood as relevant to the indicted charge that he had possessed a 9mm handgun.

We turn finally to Darden's argument that his conviction should be reversed because the prosecutor made improper statements in closing argument. A prosecutor's improper comments during closing argument can require reversal of a conviction if they "prejudiced the defendant's rights in obtaining a fair trial." United States v. Herbst, 668 F.3d 580, 586 (8th Cir. 2012) (citation omitted). In determining whether the prosecutor's conduct was prejudicial, we ordinarily look to "the

-9-

cumulative effect of the improprieties, the strength of the evidence against the defendant, and whether the district court took any curative action." Id. at 586–87 (citation omitted). If the defendant has failed timely to object to improper statements, as in this case, "we review only for plain error and reverse only under exceptional circumstances." United States v. Davis, 534 F.3d 903, 914 (8th Cir. 2008). Under this standard of review Darden must demonstrate "a reasonable probability that the outcome would have been different absent the alleged error." Herbst, 668 F.3d at 587 (citation omitted).

We begin by analyzing the content of both parties' closing arguments. In her initial closing argument, the prosecutor reviewed the elements of each crime charged and explained how the evidence at trial proved each of those elements beyond a reasonable doubt. Defense counsel set the theme for his closing argument with a quote from the children's book The Berenstain Bears and the Truth: "No matter how you hope, no matter how you try, you can't make the truth out of a lie." He later said "I don't come right out and say, police officers are liars. I don't do that. I think it's inappropriate. But ask yourself, what facts have you heard that just defy common sense[?]" He further argued that "[n]o matter how hard he hoped, no matter how hard he tried, [Detective Boettigheimer] could not make the truth out of [the CI's] lies" and that Boettigheimer had had to "stretch[]" and "manipulate[] [the] truth." Defense counsel also asked the jury to "imagine how Boettigheimer felt when there's nothing at a search warrant after he did all of his due diligence in this case," thus implying that the detective had lied about finding the 9mm gun under the mattress so that he would have something to show for his investigation.

The prosecutor began her rebuttal by referring to the theme Darden's attorney had presented, stating

> Mr. Lynch has freely used the expressions manipulation, stretching the
> truth, lying, and I would dare to say that's what you just heard. Let's go

-10-

through some of the things he just said to you that were not based on the evidence.

She then proceeded to discuss why the evidence did not support defense counsel's criticisms of the government's case.

Darden argues that the prosecutor made improper statements in her rebuttal argument when she focused on the potential consequences to police officers for giving false testimony and the risks they take on the job. He highlights the following statements as particularly problematic.

> If you find that these detectives are not telling the truth, then what you are finding is that they all got together and they entered into a criminal conspiracy to put an innocent man in prison. Every single one of them . . . they all got together and conspired to commit a crime. They risked their careers, they risked their families, they risked their lives to put this man in prison when he didn't do anything? Does that make any sense at all?
> ***
>
> If you don't believe all of these officers and you want to say that they conspired to put an innocent man in prison, look at what they do. This is the violent offenders unit. They take the biggest risk of all. They are going after people who are proven to be violent, who carry guns and cause a risk of harm to them. If you don't believe them, you are telling them that what they do is meaningless, that they might as well not do it, they might as well stay home or maybe get a new job or don't go out on the streets, don't try to help the honest residents, the people who are hearing gunfire every night and who are worried about sitting out on their porch in their own safety.
> ***
>
> Because you would be telling them that no one appreciates them and no one appreciates the job they are doing. And I don't think that's what you want to do. Thank you.

He argues that these comments in the government's rebuttal were especially harmful because he had no opportunity to respond to them. See United States v. Cannon, 88 F.3d 1495, 1503 (8th Cir. 1996), abrogated on other grounds by Watson v. United States, 552 U.S. 74 (2007). Nevertheless, he made no objection to them at the time, and our review is therefore only for plain error. See Davis, 534 F.3d at 914.

We have long recognized that it is improper for the government to imply that an acquittal would mean the jury believed that police officers acted dishonestly. See, e.g., United States v. Miller, 621 F.3d 723, 730, 732 (8th Cir. 2010). In Miller, we concluded that a prosecutor's argument, that an acquittal would have required the jury to find that a police officer was "fudg[ing]" and willing to jeopardize his future career, was improper. Id. at 730–32. While the prosecutor in this case never explicitly said that an acquittal would have required finding that police officers had lied, she strongly implied it by saying "[i]f you find that these detectives are not telling the truth, then what you are finding is that they . . . entered into a criminal conspiracy . . . . Every single one of them . . . they all got together and conspired to commit a crime." Like the prosecutor in Miller, she also focused on the risk to the officers' livelihoods, saying "[t]hey risked their careers . . . to put this man in prison when he didn't do anything? Does that make any sense at all?" She then continued her improper argument through suggesting that an acquittal would tell the officers that "no one appreciates them."

Even though these rebuttal remarks were improper, our review in this case is only for plain error, unlike the situation in Miller. See 621 F.3d at 729–30. Darden must therefore demonstrate "a reasonable probability that the outcome would have been different absent the alleged error." Herbst, 668 F.3d at 587 (citation omitted). Considering the record as a whole, we conclude Darden cannot meet this standard because of defense counsel's own remarks in closing and the large amount of evidence supporting Darden's convictions.

When analyzing the harmfulness of a prosecutor's improper remarks in closing argument, we "not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. . . . [I]f the prosecutor's remarks were 'invited,' . . . such comments would not warrant reversing a conviction." United States v. Young, 470 U.S. 1, 12–13 (1985). Given defense counsel's attack on the officers' investigation in his own closing argument, the prosecutor's subsequent comments, which attempted to reinforce the credibility of the police officers, were invited. See id. at 12. This is true of both the remarks the prosecutor made at the opening of her rebuttal and those made at the end which Darden challenges. While the prosecutor's rebuttal remarks did cross the line into impropriety at some points, any prejudice to Darden was minimized because the jury could have understood them as intended to counter defense counsel's attacks on the officers' investigation and testimony. See id. at 12, 17–18.

The wealth of evidence of Darden's guilt on the counts of conviction indicates that the result at trial would not have been different absent the prosecutor's rebuttal comments. See United States v. Barrera, 628 F.3d 1004, 1008 (8th Cir. 2011) (citation omitted) ("If the evidence of guilt is overwhelming, an improper argument is less likely to affect the jury verdict."). The government's evidence in the case before the court was much stronger than in Miller, for example, where the government's case rested on the testimony of one officer and the court recognized "curious physical evidentiary questions" that cast doubt on Miller's guilt. See 621 F.3d at 732. The prosecution's evidence here included testimony from Detective Boettigheimer and another officer that Darden had admitted possessing the 9mm firearm immediately after his arrest, testimony from Boettigheimer that Darden's grandmother had said that she saw him place a ballistic vest on her bed and an object under the mattress shortly before Boettigheimer recovered the gun there, Rule 404(b) testimony that Darden had previously been arrested after placing a gun under a mattress as in this case, testimony from the CI that Darden possessed a 9mm weapon and had left it in the Houstons' house, testimony from an officer that he had overheard

a telephone call Darden made from jail in which he told a friend to ask his grandfather to claim possession of the gun, and testimony of two officers about his having been found in possession of cocaine base.

While the dissent describes the evidence supporting the conviction as weak because it is based in part on hearsay, two officers testified concerning the most significant piece of hearsay: Darden's statement at the time of his arrest that he had placed the 9mm weapon under a mattress shortly before the officers had arrived. Although the grandparents later denied making the statements police attributed to them, evidence that Darden phoned a friend from jail and asked him to have his grandfather claim possession of the gun provides an explanation for why the grandparents may have changed their stories. The dissent suggests that the CI's credibility is suspect because he is himself a convicted felon, but Detective Boettigheimer testified that he had taken measures to corroborate the CI's story which was also supported by the evidence regarding Darden's jail message about a "nickel" and an xbox.

Moreover, the fact that the jury acquitted Darden on two of the five counts suggests that the challenged remarks did not prevent the jurors from viewing the evidence fairly and maintaining the burden of proof on the government. See United States v. Plumman, 409 F.3d 919, 930 (8th Cir. 2005). The trial record taken as a whole does not show that Darden is entitled to reversal of his convictions. Nevertheless, prosecutors are well advised not to risk losing convictions by reversal for improper rebuttal arguments.

III.

Accordingly, we affirm the judgment of the district court.

-14-

MELLOY, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's opinion except the portion concerning prosecutorial misconduct, Part II, ante at 9–13. Because I would hold that the government's misconduct in the rebuttal portion of closing argument resulted in cumulative prejudice to Lamarvin Darden's right to a fair trial, and because that misconduct impugned the fairness, integrity, and public reputation of judicial proceedings, I dissent.

For this court to reverse under plain error review, an appellant must show an "'(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Pirani, 406 F.3d 543, 550 (8th Cir. 2005) (en banc) (quoting Johnson v. United States, 520 U.S. 461, 466–67 (1997)). A showing that the error affected the defendant's substantial rights "requires a showing that the error was prejudicial and affected the trial's outcome. Factors to consider in assessing prejudice include the cumulative effect of any misconduct, the strength of the properly admitted evidence, and any curative actions taken by the trial court." United States v. Foreman, 588 F.3d 1159, 1164 (8th Cir. 2009) (internal citations and quotation marks omitted). "Generally speaking, reversal is only warranted where the verdict could reasonably have been affected by the alleged misconduct." United States v. Miller, 621 F.3d 723, 730 (8th Cir. 2010).

I.

The majority concludes that the prosecuting Assistant United States Attorney (AUSA) made improper remarks in rebuttal when implying that, to acquit Darden, the jury had to believe the police officers lied. I fully agree with this conclusion, as the AUSA's argument distorted the government's burden of proof. See United States v.

-15-

Reed, 724 F.2d 677, 681 (8th Cir. 1984). I agree as well with the majority's condemnation of the AUSA's statement that, if the officers were indeed lying, then "[t]hey risked their careers, they risked their families, they risked their lives to put this man in prison when he didn't do anything? Does that make any sense at all?" These remarks were improper. See Close v. United States, 679 F.3d 714 (8th Cir. 2012) (In Miller, "we extended this burden-of-proof principle and held that 'the government made an improper argument when it stated that an acquittal required the jury to find that Officer Smith would jeopardize his future career as a police officer.'" (quoting Miller, 621 F.3d at 732)).

The AUSA also made improper comments in rebuttal when telling the jury that an acquittal would jeopardize the rule of law and place "honest residents" at risk. A federal prosecutor may not tell the jury that it must choose between a guilty verdict and the safety of "honest residents." The prosecutor's protect-the-community argument was entirely unrelated to the jury's task in a criminal trial, which is to determine whether the government has proved its case beyond a reasonable doubt. See Washington v. United States, 327 F.2d 793, 795 (5th Cir. 1964) ("Fair comment upon the evidence did not justify the prosecutor's statement that the people of the district had 'a right to be secure in their homes.'"). "In the trial of cases to a jury in the federal courts, the arguments of counsel must be confined to the issues of the case, the applicable law, the pertinent evidence, and such legitimate inferences as may properly be drawn therefrom." London Guarantee & Accident Co. v. Woelfle, 83 F.2d 325, 342 (8th Cir. 1936). In this case, the AUSA departed from such arguments and instead appealed to the jury's emotions. "[P]rosecutors may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence." United States v. Nobari, 574 F.3d 1065, 1076 (9th Cir. 2009) (internal citation and quotation marks omitted). Violence in any community is clearly a great social concern, but "the pressing nature of the problem does not give prosecutors

-16-

license to encumber certain defendants with responsibility for the larger societal problem in addition to their own misdeeds. . . . [T]he prosecutor in this case appealed to the jurors to be the conscience of the community in an improper and inflammatory manner." United States v. Johnson, 968 F.2d 768, 771 (8th Cir. 1992).

It is particularly noteworthy that, when concluding, the AUSA highlighted the risks police officers face and then asked the jury to convict Darden as a token of appreciation to law enforcement: to do otherwise "would be telling [law enforcement] that no one appreciates them and no one appreciates the job they are doing. And I don't think that's what you want to do." This comment alone, in my view, supports the granting of a new trial. There is simply no dichotomy between an acquittal and a respect for law enforcement, and it was error to state otherwise. That the members of the jury may or may not "appreciate the job [law enforcement] is doing" has nothing to do with whether the evidence supports a conviction. See Union Elec. Light & Power Co. v. Snyder Estate Co., 65 F.2d 297, 301 (8th Cir. 1933) ("[A]rguments of counsel should be confined to the law and pertinent evidence, with such inferences as may properly be drawn therefrom."). Instead, the argument seeks to capitalize on a bias in favor of law enforcement that the AUSA sought to elicit through reference to the risks police officers face. By encouraging a bias in the jury and then requesting a conviction based on that bias, the AUSA clearly overstepped the bounds of propriety.

In addition to improperly shifting the burden of proof, making a protect-the-community argument, and encouraging a bias-based conviction, the AUSA again went out of bounds by leveling personal attacks on the integrity and competence of defense counsel before the jury. Following the conclusion of defense counsel's closing arguments, the AUSA began her rebuttal by stating to the jury: "[defense counsel] has freely used the expressions manipulation, stretching the truth, lying, and I would dare to say that's what you just heard. Let's go through some of the things he just said to you that were not based on the evidence." In addition, the AUSA asked

-17-

the jury: "What makes [defense counsel] an expert on how the police are supposed to conduct their business?  He's not."  These statements were improper because they "'encourage[d] the jury to focus on the conduct and role' of the defense team rather than the evidence, and because the inflammatory nature of the statements was designed to anger the jury through general denigration of the defense."  United States v. Rodriguez, 581 F.3d 775, 818–19 (8th Cir. 2009) (Melloy, J., concurring in part and dissenting in part) (quoting United States v. Holmes, 413 F.3d 770, 775 (8th Cir. 2005)); see also Cline v. United States, 395 F.2d 138, 141 (8th Cir. 1968) (finding it improper for a prosecutor to accuse defense counsel of dishonesty).   These arguments, just as much as the arguments the majority found to be improper, were "undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury."  United States v. Berger, 295 U.S. 78, 85 (1935).  A prosecutor's attack on defense counsel distracts the jury from the task before it.  Moreover, it "carries with it the imprimatur of the Government and [therefore] may induce the jury to trust the Government's judgment rather than its own view of the evidence."  United States v. Young, 470 U.S. 1, 18–19 (1985).  Accordingly, when "the prosecutor makes inappropriate statements there is a multiple effect which tends to tip the scales in favor of the government."  Hall v. United States,  419 F.2d 582, 588 (5th Cir. 1969).

Improper burden shifting, appeals to the jury's emotions, encouraging a bias-based conviction, and personal attacks on defense counsel are "offensive to the dignity and good order with which all proceedings in court should be conducted."  Viereck v. United States, 318 U.S. 236, 248 (1943).  Such conduct is incompatible with the prosecutor's important role in our judicial system, as prosecutors are "representative[s] not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."  Berger, 295 U.S. at 88; see also United States v. O'Connell, 841 F.2d 1408, 1428 (8th Cir. 1988) ("Comments of this nature have

no place in a criminal trial; the prosecutor's special duty as a government agent is not to convict, but to secure justice."); Isaacs v. United States, 301 F.2d 706, 736 (8th Cir. 1962) ("[I]n a criminal case, the United States Attorney has imposed upon him a high and important responsibility."). Therefore, for the reasons the majority identifies, as well as for those described in my comments above, I agree that the AUSA clearly made improper rebuttal remarks.

II.

I would hold that the cumulative effect of the AUSA's improper remarks prejudiced Darden's substantial rights. The evidence against Darden was not strong enough to overcome the prejudice caused by those remarks. Further, to the extent that there was any "invited" rebuttal, the prosecutor is not allowed to use improper comments to rebut the defense arguments.

Prosecutorial misconduct affects a defendant's substantial rights if it was prejudicial and affected the trial's outcome. United States v. McClellon, 578 F.3d 846, 859–860 (8th Cir. 2009). "Factors to consider in assessing prejudice include the cumulative effect of any misconduct, the strength of the properly admitted evidence, and any curative actions taken by the trial court." Foreman, 588 F.3d at 1164 (internal citation and quotation marks omitted). When considering the effect on the jury of the improper statements, this court considers the cumulative impact of the government's statements in the context of the trial as a whole. See Holmes, 413 F.3d at 774–75 (remanding for a new trial based on cumulative error); Isaacs, 301 F.2d at 737 ("Thus, we are required to determine whether in light of all the facts and circumstances, with particular emphasis on all of the arguments, the utterances complained of so influenced the jury as to bring about an unjust conviction.").

Taken separately, the improper remarks are problematic for the reasons outlined above. Their full effect on Darden's substantial rights, however, comes into

sharper focus when their cumulative impact is considered. "[W]e have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." Berger, 295 U.S. at 89.[4] The AUSA's misconduct in closing argument was persistent and varied. Before the jury, the AUSA: created a false dichotomy between an acquittal and a criminal conspiracy by the police, made a protect-the-community argument, leveled personal attacks against defense counsel's integrity and competence, and sought to inflame the jury and then benefit from that bias. The sheer volume of improper statements strongly suggests the presence of cumulative prejudice. Further, defense counsel had no opportunity to respond to these statements, as the AUSA made these patently improper remarks during the rebuttal portion of closing arguments. See Miller, 621 F.3d at 732 ("[T]he cumulative effect was high because of the timing of the comments."); Holmes, 413 F.3d at 776.

I would hold that the cumulative effect of the improper statements was significant enough to affect Darden's substantial rights. By impugning defense counsel's competence and integrity, the AUSA laid claim to superior legal acumen—thereby magnifying the jury's tendency to trust the government. Because of this, when the AUSA made other improper statements, the jury was apt to rely on those statements not only because they carried the imprimatur of the government but also because the prosecutor's attacks on defense counsel "suggest[ed] broader knowledge, experience and expertise by the government in such matters." Rodriguez, 581 F.3d at 819 (Melloy, J., concurring in part and dissenting in part). The Supreme Court long ago presumed that juries have "confidence that [the prosecutor's obligations] will be faithfully observed," yet as made clear in this case, because of

---

[4]I note, however, that even "a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." Johnson, 968 F.2d at 771–772 (internal quotation marks and citation omitted).

that confidence, the prosecutor's "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Berger, 295 U.S. at 88.

Further, I do not believe the "invited response" doctrine justifies the comments. It is true that defense counsel took hard shots at the investigating officers, essentially accusing them of being lazy and conducting a sloppy investigation. While defense counsel focused his arguments about lying on the confidential informant—himself a convicted felon—and did not explicitly accuse the officers of fabricating testimony, I concede he came very close to that line. The prosecutor justifiably wanted to come to the defense of the testifying officers. However, that does not give license to engage in personal attacks on defense counsel, and neither did it license the prosecutor's appeal to jury bias. If defense counsel opened the door at all, that door was only opened to arguments that right the scales: it did not open the door to improper argument limited only by the prosecutor's imagination. See Chicago & N.W. Ry. Co. v. Kelly, 84 F.2d 569, 574 (8th Cir. 1936) ("While improper argument by one counsel may elicit a response by his opponent which is also improper, without requiring a reversal, it does not open up the entire field to improper argument."). Accordingly, I disagree with the majority's suggestion that all of the prosecutor's improper statements were invited. See United States v. Flynn, 196 F.3d 927, 930 (8th Cir. 1999) ("When, as here, the prosecutor's allegedly improper comments are in response to the defendant's attack, we are called upon to determine whether the prosecutor's comments were a fair response.").

The prosecutor's personal attacks on defense counsel, plea for the jury to act as a general bulwark for law and order, appeals to emotion over reason, and inflamation of jury bias were all improper and cannot be wholly excused by the "invited response" doctrine. Here, "use of the doctrine . . . minimiz[es] the gravity of virtually unchecked prosecutorial appeals going far beyond a 'fair' response to the defense counsel's arguments." Young, 470 U.S. at 29 (Brennan, J., dissenting); see

-21-

also id. ("Rather than apply the doctrine as a limited corrective, courts frequently employ it as a rule of unclean hands that altogether prevents a defendant from successfully challenging prosecutorial improprieties."). Although the AUSA, "as an advocate, is entitled to make a fair response to the arguments of defense counsel, in [this] case, the [AUSA's] response was not fair." United States v. Lee, 743 F.2d 1240, 1255 (8th Cir. 1984).

Turning to the next factor—the strength of the properly admitted evidence—I believe that the government's case against Darden was not strong enough to overcome the cumulative effect of the misconduct. While a challenge to the sufficiency of the evidence would likely fail in this case, such a challenge is not before this court. Instead, the question is whether, in light of the strength of the evidence, there is a "'reasonable probability that the outcome would have been different absent the alleged error.'" United States v. Herbst, 668 F.3d 580, 587 (8th Cir. 2012) (quoting United States v. Littrell, 439 F.3d 875, 883 (8th Cir. 2006)). In making that assessment, the court must weigh the cumulative effect of the misconduct against the relative strength of the evidence. Miller, 621 F.3d at 732. "'If the evidence of guilt is overwhelming, an improper argument is less likely to affect the jury verdict. On the contrary, if the evidence of guilt is weak or tenuous, the existence of prejudice is more easily assumed.'" Johnson, 968 F.2d at 772 (quoting United States v. Splain, 545 F.2d 1131, 1135 (8th Cir. 1976)).

As the majority opinion makes clear, the possession case against Darden turned almost entirely on officer testimony, much of which was hearsay. The remainder of the evidence—a prior incident in which Darden placed a gun under a mattress, and testimony from a confidential informant that Darden possessed a 9mm weapon—was circumstantial and turned on the jury's credibility determination, respectively. Thus,

the evidence of Darden's guilt was neither overwhelming nor very strong.[5]  Indeed, this case "may properly be characterized as weak—depending, as it did, upon the testimony of [a convicted felon].  In these circumstances, prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence."  Berger, 295 U.S. at 89.

But for defense counsel's failure to preserve the error, this case would fall squarely within the constellation of cases in which this court has reversed a conviction for prosecutorial misconduct.  In United States v. Norton, 639 F.2d 427 (8th Cir. 1981), we reversed a conviction because "[m]uch of the testimony indicating that Norton possessed the gun was equivocal, and a defense witness rebutted, at least in part, the testimony that Norton had said he had a shotgun in the bedroom."  Id. at 429.  In this case, Darden and his grandparents controverted the statements attributed to them by law enforcement at trial.  In United States v. Conrad, 320 F.3d 851 (8th Cir. 2003), this court overturned a conviction for prosecutorial misconduct because the evidence linking the defendant to a firearm found in the defendant's shared residence was equivocal.  Id. at 856.  Here, it is clear that Darden did not enjoy exclusive dominion over the house or over the room in which the firearm was found.  Finally, in Miller, 621 F.3d at 732, this court reversed a conviction based on prosecutorial misconduct because the possession case against the defendant hinged

---

[5]This court regularly describes the proof needed to overcome misconduct as either "overwhelming" or "very strong."  United States v. Singer, 660 F.2d 1295, 1305 (8th Cir. 1981) ("We . . . affirm only because of the very strong case against the defendant and the prompt cautionary actions taken by the district judge."); see also Johnson, 968 F.2d at 772 ("In the present case, the evidence of Johnson's guilt is far from overwhelming."); United States v. King, 616 F.2d 1034, 1041 (8th Cir. 1980) ("The overwhelming evidence of guilt in this case convinces us that the prosecutor's comment could not have prejudiced King or affected the jury verdict."); Splain, 545 F.2d at 1135–1136 ("The overwhelming evidence of guilt in this case convinces us that the prosecutor's comment could not have prejudiced Splain or affected the jury verdict.").

primarily upon testimony of law enforcement—testimony that the type of prosecutorial misconduct at issue in this case rendered particularly difficult for the jury to competently evaluate. Id. ("[T]he evidence showing [that the defendant] possessed a gun may be sufficient, but it is not overwhelming."). It was the jury's role to evaluate this officer testimony and to determine whether and how much to credit it, but the prosecutor compromised that role by employing tactics "designed to elicit emotional rather than deliberative consideration" in the jury. Rodriguez, 581 F.3d at 819 (Melloy, J., concurring in part and dissenting in part).

While the evidence in this case is similar to that found in Conrad, Miller, and Norton, the level of prosecutorial misconduct in this case far outstrips the misconduct in those cases. In Conrad and Norton, the sole instance of misconduct was the prosecutor's description to the jury of the purpose behind the Gun Control Act. Conrad, 320 F.3d at 855; Norton, 639 F.2d at 428–29. In Miller, the government "insinuated that to find Miller innocent, the jury must believe that Officer Smith is" lying and that, to acquit, the jury must find "that Officer Smith would jeopardize his future career as a police officer." Miller 621 F.3d at 730–732. The prosecutorial misconduct in those cases pales in comparison to the AUSA's actions in this case, which I have recounted at length above. Thus, even if "the evidence is strong in this case, the tenor of the prosecution severely prejudiced the defendant." Conrad, 320 F.3d at 856.

Finally, I do not view the jury's partial acquittal of Darden as somehow demonstrating that the prosecutor's misconduct did not prejudice Darden. Rather, "[t]he jury's decision can just as naturally be interpreted to suggest that the evidence was close and the verdict a compromise, thus supporting a belief that the prosecutor's [misconduct] . . . did in fact have a prejudicial impact." Young, 470 U.S. at 32 (Brennan, J., dissenting).

Balancing, as we must, the strength of the evidence against the cumulative effect of the prosecutorial misconduct, I am compelled to find prejudice sufficient to establish "'a reasonable probability that the outcome would have been different absent the alleged error.'" Herbst, 668 F.3d at 587 (quoting Littrell, 439 F.3d at 883); see also Berger, 295 U.S. at 89 ("In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence."). Accordingly, the comments affected Darden's substantial rights, and I now consider whether "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Pirani, 406 F.3d at 550 (quoting Johnson v. United States, 520 U.S. 461, 466-67 (1997)); see also Rush v. Smith, 56 F.3d 918, 924 (8th Cir. 1995) (Hansen, J., concurring specially) ("I . . . would exercise our remedial discretion to reverse for a new trial because the error in this case strikes at the heart of the integrity or public reputation of judicial proceedings." (internal citation and quotation marks omitted)).

## III.

I would hold that the error in this case satisfies the fourth criterion for reversal under plain error review, in that it seriously affected the fairness, integrity, and public reputation of judicial proceedings, and I would accordingly reverse and remand for a new trial. See Pirani, 406 F.3d at 550. This fourth and final factor in the plain error analysis articulated in United States v. Olano, 507 U.S. 725, 732 (1993), comes from United States v. Atkinson, 297 U.S. 157 (1936), in which the Supreme Court wrote: "In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings." Id. at 160. For support, the Atkinson Court cited two prior cases, both of which reaffirmed a federal appellate court's authority to reverse following prejudicial statements made to the jury. See Atkinson, 297 U.S. at 160 (citing Brasfield v. United States, 272 U.S. 448,

450 (1926) (reversing criminal conviction following judge's inquiry as to the numerical division of the jury while the jury was deadlocked) and N.Y. Cent. R.R. Co. v. Johnson, 279 U.S. 310, 318 (1929) (reversing jury verdict based on respondent's "bitter and passionate attack on petitioner's conduct of the case" before the jury)). These cases demonstrate that, when engaging in plain error review, appellate courts should be especially mindful and protective of the jury's unique role in order that "the confidence of the public in [the administration of the law] be maintained." Clyatt v. United States, 197 U.S. 207, 222 (1905); see also Brasfield, 272 U.S. at 450 (plain error review is particularly appropriate "where the error . . . affects the proper relations of the court to the jury."); United States v. Williams, 399 F.3d 450, 455 (2d Cir. 2005) ("The salient characteristic of [the cases underpinning the fourth Olano factor] is that the issue was whether to correct an unpreserved error that occurred in the conduct of a jury trial."). Here, the AUSA's persistent misconduct was a sustained assault on the jury's ability to fulfil that role, thus directly implicating the core concerns animating the fourth Olano factor. See Young, 470 U.S. at 33 n.16 (Brennan, J., dissenting) ("[A] pattern and practice of intentional prosecutorial misconduct that has not been deterred through other remedies, may well so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine."); United States v. Vaughn, 443 F.2d 92, 95 (2d Cir. 1971) ("As Professor Wright has stated, 'It is not a miscarriage of justice to convict a guilty man, but if he is convicted in a way inconsistent with the fairness and integrity of judicial proceedings, then the courts should invoke the plain error rule in order to protect their own public reputation.'") (quoting 3 Wright, Federal Practice and Procedure, Criminal § 856 (1969)). The AUSA's actions, while bringing both "[the prosecutor's] office and the courts into distrust," People v. Lee Chuck, 78 Cal. 317, 329 (1889), deprived Darden of his "right to a verdict[] uninfluenced by the appeals of counsel to passion or prejudice." N.Y. Cent. R.R. Co., 279 U.S. at 318. I dissent from the majority's holding that the prosecutor's improper statements in this case do not warrant a new trial.

———————————————————————