Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/13/2018 08:38 AM CDT

State of Nebraska, appellee, v.
Teon D. Hill, appellant.
___ N.W.2d ___

Filed January 19, 2018.    No. S-16-441.

1. **Motions to Suppress: Appeal and Error.** In determining the correctness of a trial court's ruling on a motion to suppress, the appellate court will uphold the trial court's findings of fact unless they are clearly wrong, but will reach a conclusion independent of that reached by the trial court with regard to questions of law.

2. **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.

3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

4. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

5. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

6. **Effectiveness of Counsel: Appeal and Error.** Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact.

7. \_\_\_\_: \_\_\_\_. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error.

8. \_\_\_\_: \_\_\_\_. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision.

9. **Criminal Law: Trial: Prosecuting Attorneys.** Prosecutors have a duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial.

10. \_\_\_\_: \_\_\_\_: \_\_\_\_. A prosecutor's improper comments during closing argument can require reversal of a conviction if the comments prejudiced the defendant's rights in obtaining a fair trial.

11. **Trial: Prosecuting Attorneys: Appeal and Error.** In determining whether a prosecutor's conduct was prejudicial, an appellate court ordinarily looks to the cumulative effect of the improprieties, the strength of the evidence against the defendant, and whether the district court took any curative action.

12. **Trial: Prosecuting Attorneys: Jury Instructions: Appeal and Error.** Not every variance between a prosecutor's advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given and the remarks are not crucial to the State's case.

13. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.

14. **Effectiveness of Counsel: Proof: Appeal and Error.** In order to show ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a defendant must show, first, that counsel was deficient and, second, that the deficient performance actually caused prejudice to the defendant's case.

15. **Effectiveness of Counsel: Proof: Presumptions: Appeal and Error.** The two prongs of the ineffective assistance of counsel test under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable.

16. **Criminal Law: Motions for Mistrial: Proof: Appeal and Error.** A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. The defendant must prove that the alleged

error actually prejudiced him or her, rather than creating only the possibility of prejudice.

Appeal from the District Court for Douglas County: Kimberly Miller Pankonin, Judge. Affirmed.

Gregory A. Pivovar and Jeff T. Courtney, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Heavican, C.J.

## I. INTRODUCTION

On December 10, 2013, Virgil Dunn was fatally shot two blocks north of the Spencer Street housing projects in Omaha, Nebraska, in what appeared to be a robbery. On June 4, 2014, Teon D. Hill was charged in Dunn's death.

On February 24, 2016, a jury found Hill guilty of first degree murder and two counts of possession of a deadly weapon by a prohibited person. Hill was found not guilty of use of a deadly weapon (firearm) to commit a felony. On April 28, Hill was sentenced to life imprisonment on the murder conviction and 15 to 20 years' imprisonment on each conviction of possession of a deadly weapon. The latter two sentences were ordered to be served concurrently to each other and consecutively to the life sentence. Hill appeals. We affirm.

## II. BACKGROUND

### 1. Factual Background

#### (a) Homicide

A December 10, 2013, surveillance video shows Dunn making a purchase at a liquor store at 30th and Pinkney Streets in Omaha at approximately 9:54 p.m. The purchase was placed in a white plastic bag. Surveillance video indicates

that Dunn then walked toward 28th Avenue. At approximately 10 p.m., a gunshot detection system notified the Omaha Police Department of six shots fired in the area. Officers were dispatched immediately and found Dunn wounded in front of a residence located on North 28th Avenue. Dunn no longer had the plastic bag or his wallet. A baseball cap was lying on the ground approximately 50 feet from Dunn's body; Dunn had not been wearing a baseball cap in the surveillance video. Dunn was taken to the hospital, where he died of gunshot wounds shortly thereafter. There are several witness accounts in the record, but none of the witnesses actually saw the shooting.

That night, Randy Nunn was driving a van full of children from daycare at approximately 10:20 p.m. when he heard gunshots. He slowed the van and saw "two guys coming with hoodies." They were both around "five, seven; five, eight." One person was wearing a black hoodie, and the other had a "white or grayish hoody." One person was carrying a "white grocery bag," but it was difficult to see because "[i]t was dark that night." The person carrying the bag "might have had [a baseball hat]." As the two men were approaching him, Nunn "sped up" because he "didn't know if they [were] getting shot at [or] if they were shooting." Nunn looked in his rearview mirror and noticed that one of the men took longer to cross the bridge, because he "probably . . . dropped something." Nunn took the children home and told his girlfriend what he had seen. Nunn's girlfriend then called the police.

Raul Francia testified that he was at home watching television with his brother when, "just before 10 p.m.," he "heard like five, six shots." Francia opened the front door, walked outside, and "saw a guy running . . . to the projects." The man was "maybe six-foot tall," "African-American," and wearing "a black hoody or a black jacket" and "a hat maybe."

## (b) Arrest

On February 12, 2014, Metro Area Fugitive Task Force officers were conducting surveillance in the area of the

Spencer Street housing projects in Omaha, near the location of the December 10, 2013, shooting. Officers were attempting to locate a wanted fugitive, Charles Toles. Toles was described as an "African-American male, five, seven to five, nine; a hundred and sixty pounds." Officers "had been receiving tips that he was frequenting the Spencer West Housing Projects area."

Omaha police officer Jeffrey Gassaway, a member of the task force, testified that while conducting surveillance, he observed a "Ford Taurus driving slowly" with a "black male in the passenger seat who matched the general physical description of Toles," and a female driver. In fact, Hill, and not Toles, was the passenger in the Taurus. Gassaway asked U.S. Marshal Rovance Lewis, another member of the task force, to also follow the Taurus. Gassaway noticed that the Taurus accelerated as the officers began following it, and "the driver went through the stop sign." The driver of the Taurus drove in a "big square" and violated the stop sign at each corner by failing to come to a complete stop. Because the driver violated "at least six traffic control devices," Gassaway activated his vehicle's emergency lights and pulled over the Taurus at 30th and Evans Streets. The driver of the Taurus did not initially pull over in response to the activation of the emergency lights. Gassaway testified that the driver was "actively fleeing from" him and continued to make several turns, but pulled over eventually.

Gassaway and Lewis approached the Taurus simultaneously. As Gassaway approached, he "saw [Hill] reach down briefly." Based on his training and experience, this movement caused Gassaway concern, because "maybe [Hill] was concealing contraband or a weapon." Hill exited the Taurus with his hands up, and Gassaway "was 100 percent positive that it was not . . . Toles." When Gassaway observed Hill step out of the car, Gassaway "told him keep your hands in the air, and . . . Lewis approached him and took physical hold of him and just escorted him back to the back of the car." Hill disputes that he exited the Taurus voluntarily and contends that the

officers "removed [Hill] from the car."[1] Gassaway testified that he "felt that we needed to investigate further based on why this vehicle was fleeing from us and violating traffic control devices." Gassaway proceeded to ask the driver for her identification, driver's license, and vehicle registration. Gassaway observed that there was an infant in the back seat of the Taurus and that the driver was "extremely nervous and agitated," repeatedly asking if she could call her mother.

Gassaway asked the driver if she would give the officers "permission to search the vehicle, and she did." Gassaway "walked over immediately to the area where . . . Hill exited, and looked inside the vehicle underneath the seat and saw a handgun." Gassaway left the handgun in place and called the crime laboratory to photograph and collect the handgun. The handgun had six live cartridges in the cylinder. A box with live ammunition and a magazine were recovered from a black purse that was also in the vehicle. However, the handgun was a type of weapon that did not require a magazine for reloading, and the investigator determined that the magazine in the black purse "would belong to something separate" from the handgun found under the seat. Gassaway then requested the other officers who had arrived to place Hill under arrest for possession of a firearm.

### (c) Baseball Cap

An Omaha police officer testified that he was dispatched to the location of Dunn's shooting on December 10, 2013, and arrived within "one to two minutes" of dispatch. As the officer was heading north on 28th Avenue from Bristol Street, he "observed something in the street, which, as we got closer, appeared to be a red baseball cap." The cap was "in the middle of the Street on North 28th Avenue . . . south of the residence located [on] North 28th Avenue" and about 50 feet from Dunn's body.

---

[1] Brief for appellant at 20.

Melissa Helligso, a forensic DNA analyst, swabbed the inside of the cap for DNA evidence. She swabbed two different areas: inside the headband area of the cap and inside the front area of the cap. Helligso testified that she utilized "methodology and procedure that includes PCR — STR [polymerase chain reaction short tandem repeat] type of work [that] has been accredited and certified through the ASCLD [American Society of Crime Laboratory Directors] and also subject . . . to peer review." For inside the headband area, Helligso "was able to determine that the major DNA profile matches . . . Hill at all of the major alleles obtained; therefore, he's not excluded as the major contributor of the DNA tested." Helligso further stated:

> The probability of an unrelated individual matching the major DNA profile from the specimen, given that . . . Hill expresses this profile, is 1 in 1.94 quintillion, which is 10 with 18 zeros for Caucasians; 1 in 1.94 quadrillion, which is 15 zeros, for African-Americans; and 1 in 26.0 quadrillion for American Hispanics.

In regard to the front area of the cap, Helligso similarly "was able to find that [Hill] was not excluded as the major contributor to the DNA tested." Helligso stated:

> The probability that an unrelated individual matching the major DNA profile from this specimen, given that . . . Hill expresses this profile, is . . . 1 in 802 sextillion, which is 21 zeros for Caucasians; 1 in 391 quintillion, which is 18 zeros for African-Americans; and 1 in 3.78 sextillion for American Hispanics.

### (d) Spent Projectile and Jeans

A spent projectile was found within the fabric of Dunn's jacket. Helligso tested a swab of the projectile and determined that a DNA profile consistent with a single male individual was present. Helligso was able to determine that "Dunn is not excluded as the source of the DNA tested." The probability of an unrelated individual matching the DNA profile from the spent projectile, given that Dunn expresses this

DNA profile, "is 1 in 344 quintillion for Caucasians, 1 in 108 quintillion for African-Americans, and 1 in 68.0 quintillion for American Hispanics." The spent projectile was thus presumably shot into Dunn and caught in his jacket upon exiting his body. A crime laboratory technician for the forensic investigations services with the Omaha Police Department testified that based on her analysis of the spent projectile at the crime scene and a test fire from the handgun found in the Taurus, the handgun found under Hill's seat fired the spent projectile found in Dunn's jacket.

Helligso performed DNA analysis on a swab of the inside right front pocket of the jeans. Investigators swabbed the inside of Dunn's front right pocket, because Dunn was found without his wallet and investigators suspected that the shooter took the wallet from this pocket. The DNA test "generated a profile that was consistent with a mixture of at least three individuals." Dunn's DNA matched a partial profile within the major mixture of the profile, while the results were inconclusive as to Hill because his profile was not present in at least half of the loci generated in the mixture.

(e) Handgun and Live
Ammunition Rounds

Because there were no fingerprints on the handgun found under Hill's seat, DNA testing was ordered to confirm that Hill was in possession of the firearm used to shoot Dunn. Helligso analyzed a swab of the handgun for DNA and found that "there was a mixture of at least three individuals" and "there was a mixture within the major contributor." Helligso found that "Hill matches a full profile within the major mixture DNA profile, therefore, . . . Hill is not excluded as a major contributor to the DNA tested." Thus, "[t]he probability of a random individual matching a major DNA profile . . . given that . . . Hill expresses this profile, is 1 in 7.05 million for Caucasians, 1 in 2.97 million for African-Americans, and 1 in 7.70 million for American Hispanics."

Helligso also tested a swab taken of the six live ammunition rounds found in the handgun. Helligso "detected a mixture of at least two people" and "was able to determine a major contributor." Helligso found that Hill "was in 14 of the loci out of 15 of the major mixture, therefore, he's not excluded as a major profile contributor to the DNA tested." Helligso stated that "[t]he probability of a random individual matching a partial major DNA profile from this specimen, given that . . . Hill expresses this profile, is 1 in 251 million for Caucasians, 1 in 46.9 million for African-Americans, and 1 in 47.0 million for American Hispanics."

## 2. Procedural Background

On June 4, 2014, Hill was charged with count I, murder in the first degree; count II, use of a deadly weapon (firearm) to commit a felony; and counts III and IV, possession of a deadly weapon by a prohibited person. On June 5, Hill filed a plea in abatement. On August 21, following a hearing, the district court overruled Hill's plea in abatement.

On January 27, 2015, Hill filed a motion to suppress and a motion in limine. In the motion to suppress, Hill argued that the officers did not have probable cause to stop the vehicle and that the search of Hill's person and the vehicle was improper. Hill argued that the fruits of such search, namely the handgun and the live ammunition rounds, were inadmissible. In the motion in limine, Hill argued that the DNA sample taken from him was obtained without a valid warrant based on probable cause, without a valid court order, and without voluntary consent. Hill also contended that Helligso, the State's DNA witness, did not qualify as an expert and that the reasoning and methodology she used did not meet the requirements for admissibility.

On September 8, 2015, the district court overruled Hill's motion to suppress and motion in limine. In its order, the court found that (1) police had probable cause to stop the vehicle after observing multiple traffic violations; (2) Hill, as a passenger in the vehicle, did not have standing to challenge the

search, and even if he had standing, the driver consented to the search; and (3) Hill's *Daubert*/*Schafersman*[2] challenge to the introduction of DNA evidence was without merit.

At the close of the State's case on February 23, 2016, Hill made a motion to dismiss, which the court overruled. On February 24, the jury found Hill guilty of murder in the first degree and guilty of both counts of possession of a deadly weapon by a prohibited person. However, the jury found Hill not guilty of use of a deadly weapon to commit a felony. On April 28, Hill was sentenced to life imprisonment on the murder conviction, and 15 to 20 years' imprisonment on each conviction of possession by a prohibited person, to be served concurrently to each other and consecutively to the life sentence. Hill appeals.

## III. ASSIGNMENTS OF ERROR

Hill assigns, restated, that the district court erred in (1) overruling Hill's motion to suppress, (2) overruling Hill's motion in limine, (3) allowing the State's counsel in rebuttal closing arguments to argue facts not in evidence, (4) failing to find that Hill was denied effective assistance of counsel, and (5) overruling Hill's motion to dismiss and motion for directed verdict.

## IV. STANDARD OF REVIEW

[1] In determining the correctness of a trial court's ruling on a motion to suppress, the appellate court will uphold the trial court's findings of fact unless they are clearly wrong, but will reach a conclusion independent of that reached by the trial court with regard to questions of law.[3]

[2] The standard for reviewing the admissibility of expert testimony is abuse of discretion.[4]

---

[2] See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

[3] *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

[4] *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011).

[3,4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[5] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[6]

[5] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.[7]

[6-8] Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact.[8] When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error.[9] With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*,[10] an appellate court reviews such legal determinations independently of the lower court's decision.[11]

---

[5] *State v. Henry, supra* note 3.

[6] *Id.*

[7] *State v. White*, 272 Neb. 421, 722 N.W.2d 343 (2006).

[8] *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013).

[9] *Id.*

[10] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[11] *State v. Rocha, supra* note 8.

## V. ANALYSIS

### 1. Motion to Suppress

Hill argues that the district court erred in overruling the motion to suppress because "[t]here was no probable cause fo[r] the stop, nor any reasonable suspicion" and "the allegations of infractions were a pretext."[12] The State argues that the district court correctly denied Hill's motion to suppress because the officer had probable cause to believe that a traffic violation had occurred. The State contends that the officers "observed multiple traffic violations before stopping the white Taurus."[13] The district court overruled the motion to suppress, finding that the "police had probable cause to stop the vehicle after observing multiple traffic violations."

In *Whren v. United States*,[14] officers became suspicious of a vehicle waiting at a stop sign and observed the vehicle turn without signaling and speed off at an "'unreasonable'" speed. The officers pulled over the vehicle, approached, and observed plastic bags of what appeared to be crack cocaine. The petitioners asserted that the stop was not supported by reasonable suspicion or probable cause, because the "ground for approaching the vehicle—to give the driver a warning concerning traffic violations—was pretextual."[15] The U.S. Supreme Court stated that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."[16] The Court then held that "the officers had probable cause to believe that petitioners had violated the traffic code"[17] and that "[s]ubjective

---

[12] Brief for appellant at 13, 16.

[13] Brief for appellee at 9.

[14] *Whren v. United States*, 517 U.S. 806, 808, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).

[15] *Id.*, 517 U.S. at 809.

[16] *Id.*, 517 U.S. at 810.

[17] *Id.*, 517 U.S. at 819.

intentions play no role in ordinary, probable-cause Fourth Amendment analysis."[18]

In *State v. Dallmann*,[19] we addressed a defendant's contention that officers "had decided, without probable cause, to follow and stop" the defendant and used the defendant's subsequent traffic violation as "a pretext to obtain consent to search the vehicle." We rejected that argument, holding that "a traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle."[20] We further stated that "[i]f an officer has probable cause to stop a violator, the stop is objectively reasonable, and any ulterior motivation on the officer's part is irrelevant."[21]

Gassaway and Lewis testified that they observed the Taurus fail to stop at multiple stop signs and fail to signal turns. Hill attempts to distinguish this case from *Whren* by arguing that the officers "made the decision to initiate a traffic stop" by radioing the other officers before witnessing a traffic violation.[22] Hill appears to want this court to take Gassaway's and Lewis' subjective intentions into account, but this court must interpret the U.S. Supreme Court's decision in *Whren* and conclude, as it did in *Dallman*, that the officers' subjective intentions are irrelevant in the probable cause analysis. Once the officers observed the traffic violations, they had sufficient probable cause to stop the vehicle.

We note that Hill cites *State v. Van Ackeren*[23] and *U.S. v. Crawford*[24] for the proposition that "the officers were not justified in conducting an investigative stop of the Ford Taurus," because the "officers did not present any specific or articulable

---

[18] *Id.*, 517 U.S. at 813.

[19] *State v. Dallmann*, 260 Neb. 937, 948, 621 N.W.2d 86, 97 (2000).

[20] *Id.* at 949, 621 N.W.2d at 97.

[21] *Id.*

[22] Brief for appellant at 15.

[23] *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993).

[24] *U.S. v. Crawford*, 891 F.2d 680 (8th Cir. 1989).

facts which tend to show that they had reasonable suspicion that . . . Hill had or was committing a crime, and were therefore not justified in conducting the stop."[25] Here, as discussed above, the officers witnessed the driver of the vehicle commit several traffic violations and they subsequently initiated a traffic stop. Based on their observations of traffic violations, the officers had probable cause to stop the vehicle. Therefore, *Van Ackeren* and *Crawford* are inapplicable.

Next, we address Hill's contention that by searching the vehicle, the officers "went beyond the scope of a limited Terry Stop."[26] In *State v. Konfrst*,[27] we held that "[t]he right to be free from unreasonable searches and seizures may be waived by the consent of the citizen." We explained:

> When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that the permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.[28]

Gassaway testified that he asked the driver of the vehicle if she would give the officers "permission to search the vehicle, and she did." As someone who "possessed common authority over" the vehicle, the driver could provide voluntary consent to search the premises.[29] Any right that Hill possessed to be free from unreasonable search of the area under the passenger's seat was waived by the driver's consent. Therefore, we find that there was no Fourth Amendment violation in conducting the search.

---

[25] Brief for appellant at 17-18.

[26] *Id*. at 19. See *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[27] *State v. Konfrst*, 251 Neb. 214, 224, 556 N.W.2d 250, 259 (1996).

[28] *Id.* at 224-25, 556 N.W.2d at 259.

[29] See *id.*

Finally, we need not address Hill's contention that the search was unreasonable because the officers lacked probable cause to arrest him and search the vehicle incident to his arrest. Regardless of Hill's arrest, the driver consented to the search of her vehicle. The handgun Hill wishes to suppress was found in the vehicle pursuant to that consent.

We find that the district court did not err in overruling Hill's motion to suppress, because the search did not violate his Fourth Amendment rights.

Hill's first assignment of error is without merit.

## 2. Motion in Limine

Hill argues that the district court erred in overruling his motion in limine because the expert testimony did not meet the test under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[30] as it involved "samples containing mixtures for major contributors only" and utilized a database that "does not include Omaha as a sub-population" or "scientific parameters for race."[31] The district court overruled Hill's motion in limine, finding that the DNA testing met the three prongs of the *Daubert* test.

In *State v. Bauldwin*,[32] we addressed the reliability of PCR-STR analysis for mixed samples of DNA, the same analysis used in this case. In our analysis, we stated the *Daubert* standard:

> A trial judge acts as a gatekeeper for expert scientific testimony, and must determine (1) whether the expert will testify to scientific evidence and (2) if that testimony will be helpful to the trier of fact. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is scientifically valid and

---

[30] See *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra* note 2.

[31] Brief for appellant at 21-23.

[32] *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

whether that reasoning or methodology may properly be applied to the facts in issue.[33]

Applying the *Daubert* standard to the PCR-STR analysis, we found:

> The State's expert witnesses testified that the scientific community has generally accepted the PCR-STR methodology as a means to identify contributors to mixed samples of DNA. The accreditation of each individual laboratory rests, in part, on the analysts' ability to pass proficiency testing regarding mixed DNA samples. The DNA laboratory was accredited. Testimony also showed that scientific literature had been published about the PCR-STR methodology regarding mixed samples. Furthermore, we have repeatedly found that the PCR-STR analysis itself produces sufficiently reliable information to be admitted at trial. The Legislature has also recognized the reliability of the PCR-STR methodology.[34]

We further explained:

> The inability of PCR-STR analysis to definitely label the cell source of each DNA contributor in a mixed sample does not affect the underlying validity of the methodology, or its admissibility under the *Daubert/ Schafersman* framework. In essence, [the defendant] claims that the PCR-STR methodology is not scientifically valid because it is not able to do *more*—it cannot definitively identify the cell source for each contributor to a mixed DNA sample. [The defendant's] assertions, however, go to the weight of the evidence, rather than to its admissibility.[35]

---

[33] *Id.* at 702, 811 N.W.2d at 287-88, citing *Schafersman v. Agland Coop, supra* note 2.

[34] *Id.* at 704, 811 N.W.2d at 289.

[35] *Id.* (emphasis in original).

In *State v. Ellis*,[36] this court analyzed whether expert opinion testimony regarding PCR-STR testing of mixed samples of DNA was "'unduly prejudicial.'" We explained:

> [T]he purpose of examining each locus is to determine two things: (1) whether the contributor of the reference sample can be excluded as a contributor and (2) how commonly one might expect the profile that is generated to occur randomly in the population. In other words, the initial question was not whether the alleles that were found at each locus identified [the defendant] as the contributor; instead, it was whether the testing *excluded* [the defendant] as a *possible contributor*. And obviously, an allele that could be found in both [the defendant's] and [the victim's] genetic profile would not exclude [the defendant] as a possible contributor.[37]

We then turned to the second step of the analysis and stated that "the fact that the DNA sample was a mixture clearly affected the calculation of how many people might be expected to have genetic profiles consistent with the sample," however, "that goes to the weight of the evidence, not its admissibility."[38] Thus, the court held that the district court did not abuse its discretion in concluding that the DNA evidence was admissible.

As in *Bauldwin* and *Ellis*, the State's expert and a forensic DNA analyst, Helligso, provided expert testimony on PCR-STR testing of mixed DNA samples and supported her findings with testimony that the laboratory was "accredited and certified through the ASCLD," that the PCR-STR methodology is subject to publication within the field and within the general scientific community, that it is scientifically testable, and that it allows her to make determinations with a reasonable degree of scientific certainty. In regard to each piece of

---

[36] *State v. Ellis, supra* note 4, 281 Neb. at 586, 799 N.W.2d at 285.

[37] *Id.* at 587, 799 N.W.2d at 286.

[38] *Id.* at 587-88, 799 N.W.2d at 286.

DNA-tested evidence, Helligso stated whether Hill could "be excluded as a possible contributor" based on the swabs of evidence and the buccal swab from Hill.[39] Helligso then utilized the second step of the test in *Ellis*, a "frequency analysis," to determine the probability of the DNA match to another individual. This analysis was broken down into the frequency within different races.

Hill contends that Helligso may not extend "conclusions to opine that a sample may indicate identity opinions [because] the case law limits the conclusions that may be drawn," and he cites *Ellis* to support the proposition.[40] However, Hill misinterprets *Ellis*. Hill addresses only the first prong of *Ellis*, as to whether the testing excluded Hill as a possible contributor.[41] Upon application of the second prong, the frequency analysis provides how commonly one might expect the profile that is generated to occur randomly in the population.[42] As we found in *Bauldwin*, the fact that PCR-STR testing "cannot definitively identify the cell source for each contributor to a mixed DNA sample" does not make it inadmissible.[43] Instead, the frequency of occurrence in mixed samples goes to the "weight of the evidence."[44]

This court has accepted "frequency analysis" under PCR-STR methodology that analyzes the probability of the DNA match to another individual by different races and found it to be "reliable" and "relevant."[45] Furthermore, it is unclear what Hill means by "the sub-population of Omaha."[46] Hill cites no

---

[39] See *State v. Ellis, supra* note 4, 281 Neb. at 586, 799 N.W.2d at 285.

[40] Brief for appellant at 22.

[41] See *State v. Ellis, supra* note 4.

[42] *Id.*

[43] *State v. Bauldwin*, *supra* note 32, 283 Neb. at 704, 811 N.W.2d at 289.

[44] See *id.*

[45] See *State v. Fernando-Granados*, 268 Neb. 290, 312-13, 682 N.W.2d 266, 283 (2004).

[46] Brief for appellant at 21.

precedent to support his assertion, nor is there any case law requiring the database to apply to a subpopulation from the area of the crime scene in its DNA analysis. We find, as we did in *Bauldwin*, that "the PCR-STR analysis itself produces sufficiently reliable information to be admitted at trial."[47]

The district court did not abuse its discretion in admitting that testimony. Hill's second assignment of error is without merit.

### 3. State's Factual Assertion in Rebuttal Closing Argument

Hill also contends that the district court erred in denying his motion to strike a statement made by the State in rebuttal closing argument, suggesting that a neighbor witnessed the individual fleeing the scene lose his cap at or near the crime scene, when in fact this was not an accurate recitation of the facts as presented at trial. Hill takes issue with the following lines of the State's rebuttal closing argument:

> What [do Francia] and [Nunn] say? There was conversation about the hat because [cocounsel] and I, in putting those witnesses on, had them describe what they saw, and they both said, it seemed like one of them had a hat, and then when I looked again, he didn't have a hat. That's what they said.
>
> [Hill's counsel]: Objection. That's not what they said. Move to strike.
>
> THE COURT: Overruled. The jurors will remember the evidence as they remember the evidence.
>
> [State's counsel]: You're the arbiters of the facts, and take a look at it, they both talked about that, is that — they both said, as they took their initial glances, it seems that they — they had a hat and then it wasn't.

The State contends that it was not an error for the district court to overrule Hill's objection, because

---

[47] *State v. Bauldwin, supra* note 32, 283 Neb. at 704, 811 N.W.2d at 289.

[t]here was no intent to mislead the jury by the statement, it was doubtless an inadvertent remark which was the result of a logical progression of facts — if [Hill's] hat was at the scene of the shooting, and [Hill] was not, then he must have been there in sufficiently recent times so that the hat was still at the crime scene.[48]

[9,10] Prosecutors have a duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial.[49] A prosecutor's improper comments during closing argument can require reversal of a conviction if the comments "'prejudiced the defendant's rights in obtaining a fair trial.'"[50]

[11-13] In determining whether a prosecutor's conduct was prejudicial, we ordinarily look to "'the cumulative effect of the improprieties, the strength of the evidence against the defendant, and whether the district court took any curative action.'"[51] "'[N]ot every variance between [a prosecutor's] advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given' and the remarks are not crucial to the State's case."[52] Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.[53]

The State's assertion in its rebuttal closing argument was less than precise. Two witnesses testified that they saw a man running from the scene, and they both mentioned the man might have been wearing a hat. However, neither of the witnesses testified that when they looked again, the man running no longer wore a hat. In Hill's closing argument, defense counsel also addressed the factual issue and stated, "Now . . . there we are, down to two people running who may or may not have

---

[48] Brief for appellee at 31.

[49] *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

[50] *U.S. v. Darden*, 688 F.3d 382, 388 (8th Cir. 2012).

[51] *Id.*

[52] *State v. Iromuanya*, *supra* note 49, 282 Neb. at 819, 806 N.W.2d at 427.

[53] *State v. Morgan*, 286 Neb. 556, 837 N.W.2d 543 (2013).

a connection with each other. . . . [W]e don't know if they dropped a hat." Hill also stated in his closing argument:

> Remember, if you remember . . . Dunn looked out, looked around, did you see anyone heading facing [sic] him? And he said no. So . . . Francia says he cannot detect the race of the person because the hood is up, all the way to — until they see them turn and there's these lights.
>
> And, again, I asked him, did you see a hat fly off? Didn't see a hat fly off. So we have three witnesses: One who says the person with a bag had a hood up and may have had a baseball hat underneath it; and the other witness who says they see somebody running also with a hood up, can't tell the race from behind, hood is down, to be able to do that. None of them saw a hat fly off the three people fleeing the scene that were — the three people that were described as fleeing the scene.

The total record is over 1,800 pages in length. The State's closing argument was 42 pages long, and its rebuttal closing argument was 23 pages long. The State called 27 witnesses and offered 272 exhibits. The State's inaccurate statements in its rebuttal closing argument did not have a significant cumulative effect, because the State was merely connecting the extensive circumstantial evidence that had already been presented to the jury. The State's witnesses had presented testimony that the cap was found on the same street where Dunn was shot as officers reached the scene, that a man fleeing the scene might have been wearing a cap, and that one of the men witnessed fleeing the scene took longer to cross the bridge because, according to an eyewitness, he "probably . . . dropped something."

After the first statement, the district court admonished the jurors to "remember the evidence as they remember the evidence." Furthermore, jury instruction No. 12 states that "[s]tatements, arguments, and questions of the lawyers for the State and the defendant" are not evidence. We hold that the district court did not abuse its discretion in overruling Hill's

objection to the State's statements in its rebuttal closing argument. Hill's third assignment of error is without merit.

### 4. Ineffective Assistance
### of Counsel

Next, we turn to whether Hill was denied effective assistance of counsel. Under Nebraska law, in order to raise the issue of ineffective assistance of trial counsel where appellate counsel is different from trial counsel, a defendant must raise on direct appeal any issue of ineffective assistance of trial counsel which is known to the defendant or is apparent from the record, or the issue will be procedurally barred on postconviction review.[54] In this appeal, Hill asserts 10 ineffective assistance of counsel claims directed at his trial counsel.

The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.[55] An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.[56] We conclude that the record is sufficient to address some, but not all, of Hill's ineffective assistance claims.

[14,15] In order to show ineffective assistance of counsel under *Strickland v. Washington*,[57] a defendant must show, first, that counsel was deficient and, second, that the deficient performance actually caused prejudice to the defendant's case.[58] The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable.[59]

---

[54] *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

[55] *State v. Ramirez*, 284 Neb. 697, 823 N.W.2d 193 (2012).

[56] *Id.*

[57] *Strickland v. Washington, supra* note 10.

[58] *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

[59] *Id.*

### (a) Failure to Ask for Limiting
### Instruction, Admonishment to
### Jury, or Move for Mistrial

First, we address whether Hill was denied effective assistance of counsel when his attorney failed to ask for a limiting instruction, admonishment to the jury, or move for a mistrial after the district court allowed the State to assert that two witnesses testified that one of the people fleeing the shooting "had a hat," and when they "looked again," the person "didn't have a hat." Hill's trial counsel objected to the State's assertion of fact. Hill contends that trial counsel was ineffective for thereafter failing to object to the second inaccurate statement by the State that both witnesses said that "as they took their initial glances, it seems that they — they had a hat and then it wasn't," and failing to move for a mistrial. Hill contends that without the State's comments, "there would not be any evidence at all tying . . . Hill to the scene of the shooting."[60]

[16] A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[61] The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.[62]

In this case, we conclude that counsel was not deficient. Defense counsel objected to the State's comments. The judge overruled counsel's objection and admonished the jury. Any motion for mistrial would have been futile. Moreover, as noted above, the State's comments did not rise to the level of prosecutorial misconduct. As such, any deficiency by counsel was not prejudicial.

---

[60] Brief for appellant at 26.

[61] *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017).

[62] *Id.*

### (b) Failure to Share and Discuss
### Reports With Hill and Provide
### Him With Discovery

Hill contends that he saw counsel on "less than 10 occasions and most of those lasted less than 15 minutes" and that he was "not provided with a copy of the reports," nor did counsel discuss any reports with him.[63] We conclude that the record on direct appeal is insufficient for us to resolve this claim, and we therefore do not reach it.

### (c) Failure to Provide Hill With
### Depositions of Witness

Hill argues that counsel did not provide Hill with Gassaway's deposition, which prejudiced Hill by "depriving him of the right to aid in his own defense."[64] It is not possible to evaluate whether defense counsel was ineffective, because the record contains insufficient evidence as to whether Hill was present at Gassaway's deposition or whether trial counsel provided Hill with Gassaway's deposition. Because the record is insufficient to address this assignment of error, we decline to address it on direct appeal.

### (d) Failure to Take Depositions of
### Witnesses and Police Officers

Hill argues that counsel failed to take the depositions of Nunn; Francia; Francia's brother; James Dailey, who lived near the location of the crime; and officers present at the traffic stop.

Hill mentions Francia's brother in his argument, but does not include him in the assignment of error. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[65] Therefore, any alleged failure

---

[63] Supplemental brief for appellant at 27.

[64] *Id*. at 28.

[65] *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

by counsel to take Francia's brother's deposition is not preserved on review.

Hill contends that Dailey was a "key witness to the issue of robbery"[66]; however, the record shows that Dailey heard gunshots while at his home and only saw an unidentified figure, who was apparently Hill, stagger off Dailey's doorstep. Dailey did not leave his house or witness anyone else. Therefore, the record refutes Hill's claim with respect to Dailey and it is without merit.

Hill further argues that counsel failed to depose "numerous other police officers present at the site of the stop and involved in the motion to suppress."[67] But in order to avoid dismissal without an evidentiary hearing, Hill is required to specifically allege what the testimony of these witnesses would have been, had they been called in order.[68] "Without such specific allegations, the . . . court would effectively be asked to '"conduct a discovery hearing to determine if anywhere in this wide world there is some evidence favorable to defendant's position."'"[69] We find that Hill's description is not a sufficient allegation of deficient performance.

We further find that the record is not sufficient to address the claims that pertain to Nunn and Francia.

### (e) Failure to Present Evidence of Alibi Pursuant to Notice of Alibi

Hill argues that counsel filed a notice of alibi, but none of Hill's alibis were presented at trial. Hill argues that counsel failed to introduce (1) testimony from Hill's son's nurse that she met with Hill at the time of the shooting, (2) testimony from Hill's mother that she talked to Hill during the time period and "she could have testified as to where [Hill] identified himself as being and the nature of the conversation" and

---

[66] Supplemental brief for appellant at 28.

[67] *Id.*

[68] See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

[69] *Id.* at 133, 853 N.W.2d at 867.

that she "drove by his house" and "knew that he was home,"[70] and (3) telephone records from Hill's telephone.

We turn to the first claim. Hill contends that he met with his son's nurse at his home between 10 and 10:30 p.m., which was the time the record shows the shooting occurred, and that the home was located "many miles away from the scene of the shooting."[71] We conclude that Hill's first claim sufficiently alleges deficient performance, but that his second and third claims are without merit.

We turn next to the second and third claims. Hill contends that Hill's mother knew where Hill was located based on a telephone conversation at the time. Thus, Hill's mother's knowledge of Hill's location would be based solely on what Hill told her over the telephone. This is inadmissible hearsay, and the claim is without merit.

Hill further contends that Hill's mother "drove by his house" and "knew that he was home."[72] However, Hill does not provide any basis as to how Hill's mother knew that he was home. We find that this claim is insufficiently pled.

Hill also claims that his telephone records would have shown to the jury "who he talked to that night and for what period of time."[73] But Hill does not provide any further explanation as to how this could impact his alibi defense. We conclude that Hill has not sufficiently alleged deficient performance.

(f) Failure to Obtain and Introduce
Hill's Telephone Records

Hill also argues that counsel was ineffective for failing to call as witnesses the people he talked to on the telephone, "which would have proved an inability to be at the scene of the murder."[74] We conclude, for the reasons stated above, that this

---

[70] Supplemental brief for appellant at 29.

[71] *Id.*

[72] *Id.*

[73] *Id.* at 30.

[74] *Id.*

claim does not identify deficient performance and has not been sufficiently pled.

### (g) Failure to Investigate and Hire DNA Expert to Refute Findings of State's DNA Expert and to Educate Jury as to Meaning of DNA Evidence

Hill contends that counsel was ineffective for failing to call an expert to develop and contradict the State's expert testimony on the DNA results. Hill argues that "DNA is a complicated matter" and that because there were major contributors in mixed samples on the cap and on the handgun, another expert was needed to explain "the significance of those statistics and what does it mean in light of those DNA statistics being the only things tying [Hill] to both the gun and the scene of the crime."[75] The record indicates that Helligso extensively explained DNA testing in general terms and specifically explained PCR-STR testing to the jury prior to describing the DNA test results. Hill does not explain the portion of Helligso's testimony that could be refuted or what another expert could add to the testimony that Helligso did not already explain. We find that this claim has not been sufficiently pled.

### (h) Failure to Properly Advise Hill of His Right to Testify and Failure to Call Hill as Witness

Hill contends that he "wanted to present a defense and to testify" but that he waived his right to testify due to counsel's advice.[76] We conclude that the record is insufficient to address this claim.

### (i) Failure to Present Any Defense

Hill argues that counsel was ineffective for failing to present any defense. On direct appeal, an appellate court can

---

[75] *Id*. at 30-31.

[76] *Id*. at 32.

determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance.[77] An appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel when raising an ineffective assistance claim on direct appeal.[78] Hill's argument that trial counsel failed "to present any defense" does not allege specific conduct.[79] Therefore, we look only to the specific defenses further alleged by Hill.

Hill repeats several of the arguments we have already addressed and adds that "the mother of one of his children . . . would testify that he was never in the neighborhood of the murder."[80] Hill further claims that she "was even excluded from the trial throughout pursuant to the sequestration order, in contemplation of her testimony."[81] Hill provides no explanation as to what she would have said or how she could have supported Hill's alibi on the night of the shooting. Nonetheless, we find that Hill has not sufficiently pled this claim.

(j) Failure to Follow Through on
Motion for New Trial Based Upon
Inconsistent, Incongruent, and
Untenable Jury Verdict

Hill argues that counsel failed to recognize the "incongruency and inconsistency" of the jury's finding first degree murder and not finding use of a weapon to commit a felony.[82] Hill contends that "[t]he failure to pursue this motion may have foreclosed it from being considered on appellate [review] and

---

[77] *State v. Filholm, supra* note 65.

[78] *Id.*

[79] Supplemental brief for appellant at 33.

[80] *Id.*

[81] *Id.*

[82] *Id.* at 35.

if so it was ineffective assistance of counsel."[83] The record shows that the motion for new trial was withdrawn with the consent of Hill.

Hill does not explain why the withdrawal of the motion constituted ineffective assistance of counsel. He has not alleged specific conduct to constitute deficient performance; thus, his claim is not preserved for review. Hill's fourth assignment of error is without merit.

### 4. Motion to Dismiss and Motion for Directed Verdict

Hill argues that the district court erred in overruling his motion to dismiss and motion for directed verdict, because there was no eyewitness testimony placing Hill at the scene of the shooting, there was "insufficient evidence to convict"[84] Hill, the DNA testing was "[q]uestionable science,"[85] and the "alleged loss of a hat by an assailant should not have been allowed in argument to the jury."[86]

Hill was tried by a jury on four counts and convicted of first degree murder and two counts of possession of a deadly weapon by a prohibited person. Hill did not offer any evidence in his defense at trial. On February 23, 2016, Hill made a motion to dismiss at the close of the State's case and after the jury conference. The court denied Hill's motions.

As discussed above, we have concluded that the DNA evidence was admissible.[87] While there is no eyewitness testimony, there was significant circumstantial evidence supporting Hill's convictions, including DNA testing of the cap found at the scene, DNA testing of the handgun found under Hill's seat, analysis that matched the spent bullet in Dunn's jacket

---

[83] *Id.*

[84] *Id.* at 21.

[85] Brief for appellant at 23.

[86] *Id.* at 24.

[87] See *State v. Bauldwin, supra* note 32.

to the handgun found under Hill's seat, and eyewitness testimony of one or two suspects fleeing the scene of Dunn's shooting, one of whom might have been wearing a cap.

Whether the evidence presented by the State supports Hill's convictions was a matter for the finder of fact.[88] Viewing the evidence in the light most favorable to the State, we determine the record reflects sufficient evidence to sustain the convictions beyond a reasonable doubt.

Hill's fifth assignment of error is without merit.

## VI. CONCLUSION

The judgments and convictions of the district court are affirmed.

AFFIRMED.

WRIGHT, J., not participating.

---

[88] See *id.*